GUIDRY, Judge.
Defendant, John Carnell McNeal, was charged by a grand jury indictment with the crime of aggravated rape, a violation of La.R.S. 14:42. Defendant entered a plea of not guilty and proceeded to trial on May 15, 1984. Defendant was tried before a twelve person jury and found guilty by a unanimous vote. On June 6, 1984, the court sentenced defendant to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
FACTS
Shortly after midnight on the night of April 30, 1983, nineteen year old DeJuana Blackwell returned to her apartment in Many, Louisiana. Ms. Blackwell shared this apartment in the Middle Creek Apartments with her sister and nephew. Upon entering the apartment, Ms. Blackwell observed that the living room light was on. She then heard a noise coming from one of the bedrooms. Ms. Blackwell walked to her bedroom and turned on the lights, but found nothing. When she looked into her sister’s bedroom, she saw a black man crouched down in the closet. Ms. Blackwell immediately turned around and ran toward the front door of the apartment. The intruder tripped her before she reached the door and then held a knife to her throat, threatening to cut her throat if she made a sound. The man then explained to Ms. Blackwell that he did not mean to frighten her. He said that he was in the wrong apartment; that he was looking for his girlfriend who he intended to kill that night. The man then inquired as to how he could get out of the apartment without anyone noticing him. After a few more questions, the intruder instructed Ms. Blackwell to go into her bedroom. The man turned all of the lights off in the apartment as they proceeded to the bedroom. Only the porch light remained on. Once in the bedroom, the intruder pressed Ms. Blackwell against the wall, still holding the knife to her throat. He ordered her to undress, warning that if she made a sound he would kill her. Ms. Blackwell was thereafter forced to have sexual intercourse with him.
Afterwards, the man got dressed and ordered Ms. Blackwell back into the living room. He told her that he needed some money and Ms. Blackwell replied that she only had $5.00 in her purse. The man continued asking Ms. Blackwell a series of questions. Although the living room light was not on, they were seated near the *1172 front window'and the porch light was shining into the room. The man then took Ms. Blackwell into her sister’s bedroom. He told Ms. Blackwell to get into one of the twin beds and to go to sleep; that he would be gone when she woke up. He laid on the bed next to her. After a while, Ms. Blackwell heard the man breathing heavy, as if he had fallen asleep. At this time, she also heard the front door of the apartment opening. Ms. Blackwell jumped up and ran to the front door. She pushed her sister and nephew out of the apartment, screaming, “Run Pam, there is a rapist in here.” Ms. Blackwell, who was naked, ran to her mother’s home which was only a few blocks away. Her sister and nephew ran to a neighbor's apartment. The police were immediately notified of the incident.
Ms. Blackwell was taken to a hospital a short while later where she was examined by Dr. James Thomas Hill. Dr. Hill testified that Ms. Blackwell was despondent at the time but well contained. Although Dr. Hill found no bruises or cuts on the victim, he took a vaginal smear which revealed definite evidence that there had been intercourse within an eight-hour period. Dr. Hill also related a detailed account of what the victim said had happened that night. The assailant was described to Dr. Hill as being a fuzzy-headed, bearded black man. Ms. Blackwell also gave a description of her assailant to Officer Ted Delarceda as being a black male, approximately 5’7” to 5’9”, 165-170 pounds, medium colored and bearded with “nappy” hair. Officer De-larceda testified that Ms. Blackwell said the rapist had “some facial hair”, and not a full beard.
On the day after the rape, May 2, 1983, Ms. Blackwell was taken to the Shreveport Police Department where she and a police officer attempted to develop a composite picture of her assailant. A composite was made, but Ms. Blackwell was dissatisfied with the results, claiming it did not look like her assailant.
On May 5, 1983, Ms. Blackwell went to the Many Police Station where a photographic lineup was held. Ms. Blackwell was shown a series of twelve pictures in three different orders. Defendant was one of several suspects at the time and his picture was included in the lineup. Ms. Blackwell identified the picture of defendant as the man who had raped her earlier that week, each of the three times. Several weeks later, another photographic lineup was conducted. Defendant’s picture was replaced with that of another man. Ms. Blackwell was shown the twelve photos in three different sequences and replied that the person who raped her was not among the twelve. The policemen then, in shuffling the photographs the fourth time, substituted the picture of defendant back into the lineup. Ms. Blackwell again picked defendant out as being the rapist.
On June 7, 1983, an actual physical lineup was conducted in the victim’s presence. Defendant was one of six men in the lineup. Despite the fact that defendant had altered his appearance by shaving his beard and combing his hair back, Ms. Blackwell identified him as the rapist.
Defendant was indicted for aggravated rape, to which he pled not guilty. He was tried by a twelve person jury. Defendant’s sole case rested on his own testimony and that of his mother and sister. This testimony established that defendant spent the night at his mother’s apartment, which is located in the same apartment complex as the victim’s, and more specifically, is directly across from the victim’s. Defendant claims that he was asleep in the living room of his mother’s apartment at the time of the rape. Neither his mother nor his sister were able to account for his whereabouts from 11:00 p.m. on April 30, 1983 until around 9:30 a.m. the following morning, although both assumed that he was sleeping the whole time. The rape occurred between midnight and 1:00 a.m. Ms. Blackwell positively identified defendant in the courtroom as the man who raped her. By a unanimous verdict, defendant was found guilty of aggravated rape and sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
*1173 ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant contends that the identification procedure used by the Many Police Department was unduly suggestive.
The United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, reviewed a five factor test for determining the admissibility of identification testimony, as previously set forth in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In Manson, the Supreme Court stated:
“We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall confrontations. The factors to be considered are set out in Biggers. 409 U.S., at 199-200, 93 S.Ct., at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.”
In applying these factors to the instant case, it is readily apparent that the identification constituted reliable evidence and was therefore admissible. First of all, Ms. Blackwell had ample time and opportunity to view her assailant. They spoke at some length in her well lit living room prior to the rape. Ms. Blackwell was also able to see defendant in the living room after the rape occurred. Although the lights were no longer on, she could see his face by the porch light streaming into the room. Ms. Blackwell ran out of her apartment at about 1:00 a.m., thus she was in the presence of defendant for about an hour. This allowed sufficient time for her to get a good look at her assailant. Considering the nature of the crime of rape and the fact' that the victim encountered defendant face to face with the lights on, the victim clearly had an opportunity to view the rapist.
The second factor to consider is the degree of the victim’s attention. Here again, an important factor to consider is that Ms. Blackwell was originally attacked in her living room with the lights on. She was then taken into the bedroom and raped. Clearly, she was not a casual observer in this case, but had the opportunity, both before and after the rape, to get a close look at defendant’s features.
The third factor is the accuracy of the description given by the victim. Just hours after the rape occurred, Ms. Blackwell described the rapist to assistant Chief of Police, Ted Delarceda. Officer Delarceda testified that the description given to him was that of a black male, approximately 5’7" to 5’9", 165-170 pounds, medium colored, bearded with “nappy” hair, meaning that it was not combed. He later stated that Ms. Blackwell said that her assailant had “some facial hair”, and not that he was full bearded. Ms. Blackwell gave a similar description to Dr. Hill, except that she specified that her assailant was bearded. This is the same description given at the Shreveport Police Station where the victim attempted to draw up a composite sketch. Ms. Blackwell’s description of her assailant was consistent and accurate.
The fourth factor to consider is the victim’s level of certainty demonstrated at the confrontation. In the instant case, Ms. Blackwell had no trouble in picking defendant out of the twelve person photographic lineup. Despite the fact that the photos were rearranged several times, the defendant’s picture was consistently singled out as the rapist. At the actual physical lineup, the defendant was chosen despite the fact that he had altered his appearance by shaving off his beard and combing his hair back. Clearly, the victim demonstrated no uncertainty in identifying the defendant at either the photographic lineup or the actual physical lineup.
The fifth factor to consider is the time between the crime and the confrontation. As mentioned earlier, the crime occurred shortly after midnight on the night of April 30, 1983. On May 2, 1983, Ms. Blackwell *1174 was taken to Shreveport to assemble the composite picture. On May 5, 1983, she identified defendant in the photographic lineup. The actual physical lineup was held on June 7, 1983. Less than five days elapsed between the time of the rape and the photographic lineup wherein Ms. Blackwell positively identified defendant as the rapist.
Defendant asserts that the photographic and physical lineups were unduly suggestive for various reasons and therefore denied him due process of law. Defendant contends that since only two of the twelve men in the lineup had full beards, Ms. Blackwell actually only had two photos from which to choose. Defendant further asserts that this lineup was actually a learning exercise for the victim, in that, once she settled on the picture of defendant, she simply searched for this same picture in all of the following lineups.
We find this argument untenable. While it is true that only two of the men in the photographic lineups had full beards, four others had moustaches with goatees and three simply had moustaches. This left only three clean shaven men in the photographic lineup.
The Louisiana Supreme Court, in State v. Smith, 430 So.2d 31 (La.1983), stated that photographs employed in a lineup are suggestive if they display the defendant so singularly that the witness’ attention is unduly focused upon the defendant. Strict identity of physical characteristics among the persons depicted in the photo array is not required. All that is required is sufficient resemblance to reasonably test identification. State v. Guillot, 353 So.2d 1005 (La.1977).
In Guillot, the Supreme Court thoroughly reviewed the issue of the reliability of an out of court identification as evidence. The court stated that in order to determine if the lineup is suggestive, several articulable features of the person and picture must be examined. These features include height, weight, build, hair color, length and texture, facial hair, skin color and complexion, and the shape and size of the nose, eyes, lips, etc. In Guillot, the court found that if only two or three of the seven pictures could have been the defendant, this was enough to reasonably test the identification and thus there was no undue suggestiveness.
As the court noted in State v. Marchese, 430 So.2d 1303 (La.App. 1st Cir. 1983), in reviewing an identification procedure, the trial court must determine whether the procedure was so unnecessarily suggestive and so conducive to irreparable mistaken identification that the defendant was denied due process of law. In making its determination, the court must look at the totality of the circumstances surrounding the identification procedure.
Considering the fact that Ms. Blackwell described the rapist to Officer Delarceda as having “some facial hair”, we find that the identification procedure utilized in the present case was not in the least suggestive. All but three of the twelve men displayed in the photographic lineup had “some facial hair”.
In light of the Manson five factor analysis, we find that the victim in the present case had the ability to make an accurate identification of the defendant. We also find that the photographic lineup utilized was not unduly suggestive. Nevertheless, any corrupting effect of the identification was overcome by the accuracy and consistency of the victim’s identification.
This assignment of error is therefore without merit.
ASSIGNMENT OF ERROR NO. 2
The defendant contends that the trial court erred in that based on the suggestiveness of the identification procedure complained of in assignment of error no. 1, there is no competent evidence in the record to suggest that the defendant was the perpetrator of the crime of aggravated rape.
The standard of review as to the sufficiency of the evidence is whether viewing the evidence in a light most favorable to *1175 the prosecution, any rational trier of fact could have found beyond a reasonable doubt proof of each element of the crime. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984).
As previously discussed, there was no undue suggestiveness in the identification procedure utilized in the instant case. Therefore, the victim’s identification of defendant, both in and out of court, was properly admissible in evidence. The Louisiana Supreme Court has held that the testimony of the victim, without any scientific evidence of sexual intercourse, is sufficient to convince a reasonable factfinder beyond a reasonable doubt of the defendant’s guilt of forcible rape and aggravated crime against nature. State v. Rives, 407 So.2d 1195 (La.1981).
In Rives, identity of the defendant was not at issue since he was found by the police passed out in the victim’s bed. In the instant case, we have a valid identification of the defendant as the rapist in addition to scientific evidence which supports the defendant’s guilt. At trial, Rebecca Collins, an expert in serology and forensic microscopy, testified with regards to her examination of the victim’s clothing and bed sheets. She concluded that the defendant was in the 10% of the population who could have possibly committed the crime. Upon examining pubic hairs found on the victim’s sheets, the expert noted that it had the same characteristics as those of the defendant.
This evidence coupled with the positive identification of defendant by Ms. Blackwell and the fact that defendant was in the vicinity of the crime (directly across from Ms. Blackwell’s apartment), leads us to conclude that there was more than sufficient evidence presented to convince a jury beyond a reasonable doubt of defendant’s guilt. This assignment of error is without merit.
For the above and foregoing reasons, the defendant’s conviction and the sentence imposed are affirmed.
AFFIRMED.